# Order

Michigan Supreme Court
Lansing, Michigan

Clifford W. Taylor
Chief Justice

Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Justices

December 21, 2006

127547 (24)

GRIEVANCE ADMINISTRATOR,
Petitioner-Appellant,

v

GEOFFREY N. FIEGER,
Respondent-Appellee.

SC: 127547
ADB: 01-55-GA

_____/

On order of the Court, the respondent-appellee's motion for a stay of proceedings is DENIED.

This Court previously determined in this case that the First Amendment of the United States Constitution does not bar the application of the Michigan Rules of Professional Conduct to statements made by respondent-attorney Geoffrey Fieger in the course of a pending lawsuit in the Court of Appeals. Specifically, Mr. Fieger stated that he "declared war upon" the judges hearing his lawsuit, that such judges could "kiss his ass," that his client should "shove [his finger] up their asses," that they were "three jackass Court of Appeals judges," that "the only thing that's in their 'endo' should be a large plunger about the size of my fist," and that the judges had "changed their name from Adolf Hitler and Goebbels, and -- what was Hitler's [mistress] -- Eva Braun."

Such statements were determined to be in violation of MRPC 3.5(c) (which prohibits undignified or discourteous conduct by an attorney toward the court) and MRPC 6.5(a) (which requires an attorney to treat with courtesy and respect all persons involved in the legal process). As a result, in accordance with an agreement entered into between Mr. Fieger and the Attorney Grievance Commission, he is to be reprimanded but allowed without limitation to continue his practice of law.

We are now confronted with Mr. Fieger's motion that this Court "stay" its judgment pending his application for certiorari with the United States

1

Supreme Court. Such "stay" would delay the implementation of the Attorney Grievance Commission's order of reprimand.

This Court may grant a "stay" of its judgments pending applications for certiorari when "irreparable injury would be suffered by the failure" to do so. *Red Star Motor Drivers Association v Detroit*, 236 Mich 422, 424-425 (1926). That such a "stay" is truly extraordinary is reflected by the fact that we can identify only a single case over the past two decades in which such a stay has been granted by this Court. *Romein v General Motors* (Docket No. 83830), December 27, 1990. Rather, it is almost always the case that the judgments of this Court, as with those of every other Supreme Court in the Union, are not "stayed" pending applications for United States Supreme Court review, in part because of the rarity of that Court granting such review.

Despite the arguments of our dissenting colleagues, Mr. Fieger's motion must be denied simply because there is no evidence whatsoever that he would suffer any "irreparable injury" by this Court's failure to grant a "stay." He can continue to practice law during his application for certiorari and, if he prevails in the United States Supreme Court, his reprimand will be undone. This is not a hard case or a close call, in our judgment.

In light then of this Court's very clear historical practice -- that is, granting "stays" under only the most truly extraordinary circumstances -- we can only observe with wonderment the dissenters' empassioned arguments that the present case involves such circumstances.

This Court (including without exception the dissenting Justices) has not granted "stays" when persons were incarcerated in prison pending United States Supreme Court review; it has not granted "stays" when persons' fortunes and properties were at stake pending such review; it has not granted "stays" when the interpretation of laws and constitutions was in controversy pending such review; and it has not granted "stays" even when matters of child custody and parental termination were in dispute pending such review. Yet, the dissenting Justices insist that we must grant this almost-unprecedented relief in the instant case in which they have barely labored to demonstrate any "irreparable injury." It is not this majority that must demonstrate why the law should not be applied in its normal fashion, but the dissenters that must demonstrate why the law should be applied, as they propose, in an abnormal fashion.

Finally, concerning the various proposals offered by the dissenting Justices for resolving judicial disqualification motions -- a majority of which have come from respondent in recent years -- we do not believe that all such proposals are necessarily unreasonable, merely that it is also not unreasonable to continue to

2

abide by disqualification procedures that have been followed in this Court since its inception, that obtain within the overwhelming number of state judiciaries -- as well as within the federal courts and the United States Supreme Court -- and that have been abided by each of the dissenting Justices themselves for periods of between ten and twenty-four years on this Court without apparent previous concern.

TAYLOR, C.J., concurs and states as follows:

I concur in the order denying the stay. I write separately to state that I and my colleagues joining in this order cannot respond to Justice Weaver's selective and misleading disclosures of our conference deliberations and internal memorandums because we view her disclosure as a violation of Administrative Order No. 2006-8, and a breach of this Court's deliberative process. We have struggled with this matter for months and, by order dated December 20, 2006, seek public comment on how the integrity of this Court's deliberative process can be maintained in the light of a justice who feels no obligation to respect the confidentiality that has always characterized the deliberations of this Court, the United States Supreme Court and every other appellate court of the United States. It must be noted that, despite the fact that a justice of this Court has now engaged, and continues to engage, in the unprecedented act of revealing deliberative confidences, every word of every statement of hers has been made public exactly as she has written it.

I repeat again the questions that the Court has posed to the public for consideration at our public hearing on January 17, 2007: Should AO 2006-8, which formally establishes the deliberative privilege rule, be retained and, if it is retained, what means of enforcement or sanction, if any, are properly adopted in response if a justice violates it?

CORRIGAN, YOUNG, and MARKMAN, JJ., join the statement of TAYLOR, C.J.

CAVANAGH, J., dissents and states as follows:

I would grant the motion for a stay of proceedings. As discussed in my dissent in *Grievance Administrator v Fieger*, 476 Mich 231 (2006), I believe that the majority violated attorney Geoffrey Fieger's First Amendment rights when it held that his comments were not political speech protected by the United States and Michigan Constitutions. Geoffrey Fieger is raising this issue in his petition to the United States Supreme Court for a writ of certiorari, as well as raising the matter of how judicial disqualifications are handled by our Court. Because I believe that our current disqualification process does not afford parties adequate

3

constitutional protections, I also write to express my extreme disapproval of the majority's decision to abandon this Court's earlier determination that proposals for the disqualification of justices would be published for public comment. The closure of this administrative file without public comment is expressly contrary to the majority's earlier explicit guarantee that these proposals would indeed be published for public review and comment. See *Fieger, supra* at 327 n 17 (Cavanagh, J., dissenting), and *In re Haley*, 476 Mich 180, 201 n 1 (2006) (Cavanagh, J., concurring).

Publishing the proposals for public comment does not require the Court to adopt any of the proposals. It merely provides the public -- the very people who the law is meant to protect -- the opportunity to express their opinions on a matter that is critical to ensuring fundamental fairness and due process for all Michigan citizens. The majority's disinterest in hearing from the public on this issue can only be viewed as evidence that the majority believes its actions are beyond public scrutiny or its recognition that there is no supportable reason for allowing only the justice asked to disqualify himself to be the determiner of whether disqualification is warranted. No other rational or reasonable explanations for the majority's determined efforts to veil its actions from the public exist.

Notably, in a poll taken by *Michigan Lawyer's Weekly*, over 80 percent of the respondents indicated that a change in the disqualification process was warranted. Yet, even in the face of such overwhelming support, the majority chooses to not even *consider* remarks from the public on this issue. Instead of allowing the public to comment on a process that has far-reaching ramifications for Michigan's justice system, the majority chooses to favor continuing a process that provides no due process protections to the parties who appear before this Court.

The process by which justices are disqualified from hearing a case before this Court is not merely a theoretical matter. The disqualification process has very real consequences for the parties who seek justice from this Court, as well as the public at large. Our current practice provides no avenue to redress a decision by a justice who refuses to disqualify himself, no matter how much evidence is produced that the justice is indeed actually biased. To use an exaggerated example to illustrate the flaw in our current policy, consider the following example. Justice X attends a party. He remarks to several people that attorney Smith has nothing to worry about when his case appears before the Court because Justice X "has his back covered" and there is no way that attorney Smith can lose, no matter the merits of the case. These remarks are brought to the attention of attorney Jones, attorney Smith's opponent, who then files a motion to disqualify Justice X, supporting the motion with a number of well-detailed and

4

well-supported affidavits. Under our current procedure -- and with the full support of the majority -- only Justice X decides whether he should disqualify himself from hearing the case. If Justice X chooses not to disqualify himself, then attorney Jones has no recourse. He must proceed to argue a case in front of our state's highest court, knowing full well that at least one of the justices will not be deciding the case on its merits. The bias of even one justice taints the tribunal.

I am disturbed by attempts by the majority to keep the public from commenting on this issue. If my colleagues truly believe that our current practice is the best for Michigan's citizens, then they should have no problem explaining their rationale to the public and hearing the public's assessment of this rationale. However, I believe they know that there is no reasonable justification that can be proffered for allowing a justice accused of bias to be the only one who decides whether he should be disqualified. I can think of no reasonable explanation that would be acceptable to the public for maintaining this procedure because it is apparent that it is incongruous with reason. This is especially true in light of the fact that Michigan's own court rules -- adopted by *this Court* -- govern disqualifications for all other judges and explicitly provide the recourse of having the denial of a disqualification motion reviewed by another judge. See MCR 2.003(C)(3). Remarkably, the majority believes that members of this Court are above the same rules that it has adopted to apply to *all other judges in the state*.

For our system of justice to continue to have any validity, our citizens must have faith in judges. My colleagues' unabashed embrace of a procedure that does not afford due process and fundamental fairness to all parties who appear before the Court does nothing to instill confidence in an impartial judiciary. While the majority's willingness to breach its word does not bode well for the possibility that our disqualification procedure will be examined at any point in the near future, I strongly urge my colleagues to reconsider and remember that a fair and balanced procedure, made known to the public, would benefit our citizens now and in the future. It would apply to all justices, no matter the composition of the Court. This is not a partisan issue, but a matter of ensuring fundamental fairness and due process to all those who seek justice before this Court now and long after my colleagues and I are gone.

Finally, I disagree with Chief Justice Taylor's contention that Justice Weaver's statement violates deliberative privilege. I have reviewed every aspect of the dissenting statement and have extensively researched the applicable areas of the law, including deliberative privilege. While the statement is obviously discomforting for the majority, I believe that the statement does not run afoul of any law. The statement merely references past actions taken and voted on by members of this Court on administrative matters. I further note that the statement does not contravene recent Administrative Order No. 2006-8, which the majority

5

voted in favor of. The administrative order allows for the disclosure of any unethical, improper, or criminal conduct. While I do not believe that the administrative order is relevant to this case because no substantive information on a past or pending case is being disclosed, any arguably substantive information in the statement could reasonably be said to fall within the administrative order's parameters. Thus, I believe that Justice Weaver has done nothing improper by releasing her statement.

Weaver, J., dissents and states as follows:

## Preamble

Given recent events since December 5, 2006, it has become incumbent upon me to provide an explanation as a preamble to my dissent filed on December 5, 2006 in this matter. On December 6, 2006, Administrative Order 2006-08 (AO 2006-08), the "gag order" was adopted by a 4-3 vote by Chief Justice Taylor and Justices Corrigan, Young, and Markman.[1] Shortly thereafter, it was moved, seconded, and adopted by a 4-3 vote, by Chief Justice Taylor and Justices Corrigan, Young, and Markman, to suppress my dissent in *Grievance Administrator v Fieger,* #127547, motion to stay. Justices Cavanagh, Weaver and Kelly dissented. Chief Justice Taylor then ordered the Clerk of the Court, who

---

[1] Justices Cavanagh, Weaver and Kelly dissented to the adoption of AO 2006-08, the "gag order." My dissent to AO 2006-08, which I filed with the Clerk of the Court on December 19, 2006, is attached as Appendix D On December 20, 2006, a majority of the Court agreed to publish my dissent to AO 2006-08 and to place the adoption of AO 2006-08 on the next public administrative hearing scheduled for January 17, 2007. See http://courts.michigan.gov/supremecourt/(accessed on December 20, 2006). I concurred only with the decision to place AO 2006-08 on the January 17, 2007 public administrative hearing agenda. I dissented as to the remaining language of the order. See my concurring and dissenting statement to the December 20, 2006 order placing AO 2006-08 on the January 17, 2007 public administrative hearing agenda, attached hereto as Appendix E.

was present, not to publish my December 5, 2006 dissent to the denial of the motion to stay in this case, *Grievance Administrator v Fieger*.

On December 15, 2006, Chief Justice Taylor submitted a concurrence in which he stated, "with the concurrence of the majority of the court, I have directed the Clerk of Court not to include Justice Weaver's dissenting statement in the Court's publications in this file."

On December 21, 2006, Chief Justice Taylor submitted yet another concurrence, withdrawing his December 15, 2006, concurrence, and announced by memorandum to the Court that he, as well as Justices Corrigan, Young and Markman, after characterizing their December 6, 2006 formal vote ordering the suppression of my dissent as a "preliminary directive," had now decided to permit the publication of my dissent. The vote by the majority of four, ordering the suppression of my dissent was not a "preliminary directive." It was a formal vote taken by the majority of four during a scheduled judicial conference, to which Justices Cavanagh, Kelly and I formally dissented.

It is wise for the majority of four to have decided not to suppress my dissent in this case. However, I note that Chief Justice Taylor in his concurrence continues to assert that the majority of four have the power to suppress a dissenting justice's opinions. He further states that he wishes to explore "what means of enforcement or sanction, if any, are properly adopted in response if a Justice violates it [AO 2006-08, the "gag order"]."

7

In addition to the disorderly manner in which the majority of four have withdrawn their prior formal votes to order the suppression of my dissent in this case, the substance of Chief Justice Taylor's latest concurrence dated December 21, 2006 still incorrectly asserts that no Justice until now has failed "to respect the confidentiality that has always characterized the deliberations of this Court, the United States Supreme Court, and every other appellate court in the United States." This statement is not true. There have been instances both in the past and present, in which Justices have made reference to matters discussed at conference, and to actions before the Court.[2]

---

[2] For example, most recently, in Justice CAVANAGH'S concurring statement in *In re Haley,* 476 Mich 180, 201 n 1 (2006), he stated:

> This Court is currently engaged in a discussion about the proper procedure for judicial disqualifications, as well as the ethical standards implicated in such a procedure. Further, this Court will soon be asking for public comment and input to further this discussion in a more open manner.

In addition, in his dissent in *Grievance Administrator v Fieger,* 476 Mich 231, 327 n 17, Justice CAVANAGH stated:

> Further, while I do not join in the fray between the majority and my colleague Justice WEAVER, I take this opportunity to note that three alternate proposals, two of which have been crafted by this majority, regarding how this Court should handle disqualification motions have been languishing in this Court's conference room for a substantial period of time. In the same way I will look forward to the dust settling from the case at bar, I will similarly anticipate this Court's timely attention to the important matter of disqualification motions. I take my colleagues at their

**Footnotes continued on following page.**

Moreover, Chief Justice Taylor fails to substantiate the existence in Michigan, or anywhere else for that matter, of the so called "judicial deliberative privilege" allegedly based on unwritten traditions. Chief Justice TAYLOR's apparent absolutism regarding the nature of any Michigan so called "judicial deliberative privilege" is misguided and would misserve the Michigan judiciary and the people of Michigan. It runs afoul of the First Amendment, common sense, good government, and Michigan Supreme Court history, as evidenced most recently by the concurring statement filed by Justice CAVANAGH in *In re Haley, supra* and the dissenting statement filed by Justice CAVANAGH in *Grievance Administrator v Fieger, supra.*[3] The majority of four's so called "judicial deliberative privilege" wrongly casts "a cloak of secrecy around the operations" of the Michigan Supreme Court.[4] (See Appendix D.)

---

word that the issue of disqualification will be handled in a prompt manner in the coming months.

Note that Justice Cavanagh's statements, published in his concurrence in *Haley,* and in his dissent in *Fieger,* were not objected to by any Justice, including the majority of four.

In addition to these more recent references to matters discussed at judicial conferences, see in *In re Mathers,* 371 Mich 516 (1963).

[3] See n 2 , *supra.*

[4] *Scott v Flowers,* 910 F2d 201, 213 (5th Cir 1990)

9

I also disagree with Chief Justice TAYLOR regarding the nature of what is revealed in my dissent. The information revealed in my dissent is not protected by AO 2006-08, the "gag order," nor is it protected by Administrative Order 1997-10 (AO 1997-10). AO 1997-10 addresses what this Court will reveal upon a *public demand for information*; it does not restrict a Justice from releasing information that a Justice deems is necessary for the public to know.

Further, AO 2006-08, the "gag order," as adopted by a 4-3 vote on December 6, 2006, by its own terms applies to "cases and controversies," not to every discussion that ever occurs among Justices. My dissent contains references to discussion of an *administrative file*, ADM 2003-26, which was not a *case or controversy* of the Court.

Only once did any justice of the majority of four point out exactly what within my dissent they wished removed. Upon her identification of the offending passages, this was my response in my December 1, 2006 memorandum to Justice Corrigan's memorandum of November 20, 2006:

> [W]hile Justice CORRIGAN identifies several statements in my dissent that she asserts should be removed, I will not be deleting any of the identified statements as explained as follows:
>
> 1)    Justice CORRIGAN would like me to remove my discussion of her telephone call to me in 2003 during the *In re JK* [*infra*] case. It is simply a <u>fact</u> that she did call me. The call did not involve substantive discussion of or debate regarding the case, and thus was not privileged. The publication of her phone call to me should not concern her now, since over three years ago essentially the same information was published with no complaint in my statement of non-participation in that case. [*See* Appendix F for footnote.] Further, the *In re JK* case is not pending or impending in

10

any court; thus under Canon 3A(6), I am free to disclose information regarding that case as well as under a *Pickering, [infra]* analysis.

2) Justice CORRIGAN objects to the reference to statements by members of the majority during conference regarding the ADM 2003-26 file. The statements are not privileged because they were made with regard to an administrative file and because they amounted to nothing more than personal attacks. The statements made during the conference regarding the refusal to publish the disqualification proposals were not substantive.

3) Justice CORRIGAN objects to my reference to a statement in her July 11, 2006 memo that she circulated to the justices and Court staff with regard to the ADM 2003-26 file. However, Justice CORRIGAN sent that memo in reference to the justice disqualification administrative file, and thus it is not protected by Canon 3A. The memo does not qualify as a deliberation on the *Fieger* case. In the memo Justice CORRIGAN divulged that she would change her vote on the publication of the justice disqualification proposals because of my position on the merits of Mr. Fieger's motion for her disqualification in *Grievance Administrator v Fieger*. The memo reveals that improper, if not unethical, considerations motivated her decision to vote to close ADM 2003-26. Indeed, the memo could be seen as an attempt to persuade me to withdraw my dissent in *Grievance Administrator v Fieger* or risk abandonment of the progress that had apparently been made at that time on the ADM 2003-26 administrative file.

Chief Justice TAYLOR similarly suggested in an October 23, 2006 memo that he might change his vote and grant the stay in this case *if* I would not release my dissenting statement. Part of his proposed deal was that I "never again" attempt such a dissent. As I noted in my October 25, 2006 response, "Such deal-making would be unethical and interfere with the fair and orderly decision-making of this Court."

Thus, Justice CORRIGAN's statement is a legitimate matter of public concern and thus, it is not privileged from disclosure. Finally, even if Justice CORRIGAN's memo were characterized as relating to the substance of the *Fieger* case (which it does not) then it is not protected by Canon 3A(6) because once the order on respondent's motion for stay is published, the case will no longer be pending or impending in any court.

4) Justice CORRIGAN also objects to my reference to what she asserts were "preliminary votes" on the ADM 2003-26 file.

However, when a majority of four justices votes to close an administrative file, or to adopt an IOP, nothing further is necessary to make the action final. As viewed on November 30, 2006, the disclaimer to the IOP's published at this Court's website still expressly state that:

> the internal procedures outlined in this document are only *general* guidelines and may be modified at any time without prior notice by a majority vote. These internal procedures create no enforceable rights in any litigant.[http://courts.michigan.gov/supremecourt/ (accessed on November 30, 2006).

Suggesting that such actions, as the March 1, 2006 vote to adopt the IOP on disqualification and the September 7, 2006 vote to close the ADM 2003-26 file, were merely "preliminary," is not supportable. Whatever differing views of its scope or boundaries, the deliberative privilege does not prevent a justice from reporting the fact that this Court has taken formal actions or votes on an administrative file.

Similarly, Justice CORRIGAN has indicated by highlighting that she objects to my reference to the fact that ADM 2003-26 was opened in May 2003. An administrative file can be opened at the request of only one justice. It is wrong to suggest that I cannot refer to the fact that ADM 2003-26 was opened in 2003 at my request. That fact has been published and republished, [s]ee e.g. *Advocacy Org for Patients & Providers v Auto Club Ins Ass'n*, 472 Mich 91, 100 (2005), *McDowell v Detroit*, 474 Mich 999, 1000 (2006), *Stamplis v St John Health Sys*, 474 Mich 1017 (2006), *Heikkila v North Star Trucking, Inc*, 474 Mich 1080, 1081 (2006), and *Lewis v St John Hosp*, 474 Mich 1089 (2006), so it is illogical for Justice CORRIGAN to suggest now that my mention of it is suddenly a problem.

Justice CORRIGAN also indicated by her highlighting that she objects to my reference to the closure of the ADM 2003-26 file on September 7, 2006. But the fact that the file was closed by a four to three vote is simply fact and reveals no substantive deliberation. If the file had not in fact been closed, I certainly would not have spent the time on a dissent to its closure. Both the vote at the table and the

12

Clerk of the Court's notes circulated after conference on September 7, 2006 reveal that the ADM 2003-26 file was closed by a four to three vote. ADM 2003-26 has not been returned to an administrative agenda, because it was closed.

It has become apparent that the majority of four, Chief Justice TAYLOR, and Justices CORRIGAN, YOUNG, and MARKMAN have great difficulty with dissent. Perhaps the issue at hand is too close to them. This is perhaps another reason why they should have recused themselves from this case, *Grievance Administrator v Fieger*. They have had many opportunities to recuse themselves during the two years that this case has been before this Court.

On December 20, 2006, without notice to fellow justices, during the regularly scheduled judicial conference, Chief Justice TAYLOR abruptly announced that he wanted to discuss this case, *Grievance Administrator v Fieger*, #127547, (motion to stay) despite the fact that this case was not listed on the December 20, 2006 conference agenda. Chief Justice Taylor stated that his basis for suddenly putting the matter on the Court's conference agenda was that attorney Geoffrey Fieger's appeal to the United States Supreme Court in *Grievance Administrator v Fieger* was scheduled on the United States Supreme Court's conference agenda for January 5, 2007.

On December 21, 2006, the majority of four, Chief Justice TAYLOR, and Justices CORRIGAN, YOUNG and MARKMAN, having characterized as straw votes their December 6, 2006 formal votes to order the suppression of my December 5,

13

2006 dissent in this case, have decided to permit the publication of my dissent to *Grievance Administrator v Fieger,* #127547, motion to stay.

Here now is my December 5, 2006 dissent to *Grievance Administrator v Fieger,* #127547, motion to stay, which was ordered suppressed by the majority of four by a 4-3 vote on December 6, 2006, and which has now, on December 21, 2006, been magically "unsuppressed" by the same majority of four.

Justice Weaver's December 5, 2006 Dissent:

I dissent from Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN'S denial of respondent attorney Geoffrey Fieger's motion for a stay of proceedings in light of his intent to appeal this Court's decision in *Grievance Administrator v Fieger,* 476 Mich 231 (2006), to the United States Supreme Court. Because this majority of four's participation in this case violated respondent's due process rights, I would grant the motion for a stay.

Further, at an unannounced and unscheduled executive session on November 13, 2006, the majority of four adopted an Internal Operating Procedure (IOP)—a secret "gag rule"—in an attempt to prevent me from including information in this dissent that I believe needs to be known by the public for the sake of justice in this case and to alert the public to the serious attempts by the

14

majority of four to advance a policy of more secrecy and less accountability for the justices of this Court.[5]

Let it be known that no Michigan law prohibits my publication of any information contained within this dissent. Further, were the majority's secret "gag rule" enforceable against me, which it is not, it does not cover any information within this dissent.

The public needs to have information on how the justices conduct the people's judicial business in order to assess the justices' performance of their duties and to hold the justices accountable. An efficient and impartial judiciary is "ill served by casting a cloak of secrecy around the operations of the courts."[6]

Thus, this dissent addresses the majority of four's handling and abrupt closure of the administrative file, ADM 2003-26, that was opened to reform the standards governing justice disqualification decisions. Their actions on this

---

[5] The majority of four's adoption of the IOP/secret "gag rule" is explained in detail in part V of this dissent.

Noted there is the fact that at the close of the November 29, 2006, conference, it was moved, seconded, and tabled that a slightly edited version of the new secret "gag rule" be adopted as an emergency *court rule* having immediate effect, without notice or public comment before its adoption.

[6] *Scott v Flowers,* 910 F2d 201 (CA 5, 1990).

15

administrative file raise questions regarding this Court's handling of disqualification decisions and their participation in this case.[7]

## I. Introduction

The respondent moved for the disqualification of Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN from this case. He moved a second time for the disqualification of Justices CORRIGAN and MARKMAN. The disqualification motions were denied.[8]

Consistent with our Michigan Court Rules, MCR 2.003, I did not participate in the decisions on the disqualification motions. However, on the merits of the case, I stated that the participation of Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN violated respondent's right to due process under the Fifth and Fourteenth amendments.[9] This is so because Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN have displayed

---

[7] The majority of four's handling of justice disqualification motions and ADM 2003-26 is explained in detail in parts II, III, and IV of this dissent.

[8] See Grievance Administrator v Fieger, 472 Mich 1244 (2005), and Grievance Administrator v Fieger, 475 Mich 1211 (2006).

[9] See *Grievance Administrator v Fieger*, 476 Mich 231 (2006)(WEAVER, J., dissenting). The majority of four in a separate opinion attacked me personally for dissenting with respect to their participation in the case. I believed that it was my duty to give my reasons for my dissent, and I continue to believe that the participation of Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN violated and continues to violate respondent's due process rights. This Court is not a secret society. A justice's duty is first and foremost to the people of Michigan. This duty includes informing the public when justices fail to abide by due process by participating in a case when they should not.

bias and prejudice against Mr. Fieger during their judicial campaigns.[10] Moreover, Chief Justice TAYLOR and Justices CORRIGAN and MARKMAN have become so "enmeshed" in matters involving Mr. Fieger as to make it inappropriate for them to sit in a case in which he is a party.[11]

Respondent has indicated his intent to raise the issue of judicial disqualification in his petition to the United States Supreme Court for a writ of certiorari. In light of this, respondent's motion for a stay of proceedings should be granted because the majority of four has failed to follow fair and enforceable procedures in this case.

It cannot be disputed that the decision-making process of the Michigan Supreme Court is seriously flawed when a justice who is, or appears to be, biased or prejudiced against a party participates in a case. An unbiased judge is essential to the due process guarantees of the Fifth and Fourteenth amendments of the United States Constitution.

Thus, I write further on this motion to explain how the disposition of this case underscores this Court's need to reform its helter-skelter approach to motions for the disqualification of justices. It is a matter of serious public concern that this Court has not acted to ensure that there are clear, fair, and enforceable court rules concerning the participation or disqualification of justices and has, through

---

[10] *Republican Party of Minnesota v White*, 536 US 765 (2002).

[11] *Johnson v Mississippi*, 403 US 212 (1971).

decisions on adjudicated cases, lowered the standards that were there for justice disqualification decisions. Given that just one justice's decision to not participate in a case such as this case can alter the disposition of the case, minimal due process requires, and the public deserves, higher standards to be established and enforced regarding how justice disqualification decisions are made.

## II. How the Recently Closed Administrative File on Justice Disqualification, ADM 2003-26 is Relevant to *Grievance Administrator v Fieger.*

An administrative file on the standards that should govern how justices handle motions for their disqualification, ADM 2003-26, was opened at my request three years ago in May 2003. It was not until three years later, while this case was pending, that the Court actively considered the standards that should govern the participation and disqualification of justices. Yet, following the decision in this case, the majority of four abruptly voted to cease consideration of ADM 2003-26 and to close the file.

My request over three years ago that the Court open an administrative file to examine the rules governing justice disqualification decisions was motivated by my own experience in the case of *In re JK,* 468 Mich 202 (2003), when I had

reason to examine the rules governing my own participation or disqualification in that case.[12]

During the consideration of *In re JK*, I was informed that unwritten "traditions" governed the decision and that, MCR 2.003 the court rule concerning disqualification of all other Michigan judges, did not apply to justices of the Michigan Supreme Court. I was further informed that it was a "tradition" of the Court that the decision whether a justice would disqualify himself or herself was left to the individual justice and that no reasons for the decision whether to participate or not participate in a case were to be given.

I concluded that these unwritten traditions and the unfettered discretion violate Michigan's Constitution, which requires justices to give written reasons for

---

[12] My concern regarding the lack of clear, fair, and enforceable court rules governing justice disqualification was prompted by issues related to my own participation in *In re JK*, 468 Mich 202 (2003). (Mr. Fieger was not involved in the *In re JK* case.) In that case, a termination of parental rights case, my participation was questioned by then-Chief Justice CORRIGAN. She contacted me on May 2, 2003, to suggest that my contact with a staff person for the Governor's Task Force on Juvenile Justice (a federally mandated and funded task force on child abuse and neglect of which I am chairperson) who was also an employee of the Family Independence Agency central office in Lansing could be considered an ex parte communication, contrary to Canon 3 of the Code of Judicial Conduct.

I had the clerk of the Supreme Court send the parties and attorneys a letter detailing the substance of the communication, following the procedure outlined in MCR 2.003(D) for remittal of disqualification. In recognition of the need to expedite the case for the sake of the child, in deference to the respondent's decision not to waive any possible disqualification, and to maintain public trust and confidence in the judiciary, I decided not to participate in the case. Since May 2003, I have applied MCR 2.003 to my own decisions on whether to participate in a case where there is a motion for my disqualification.

each decision, including a decision to participate in or be disqualified from a case.[13]

Because the Court's traditions were clearly inadequate, in *In re JK, supra,* I followed the remittal of disqualification procedure provided by MCR 2.003(D). In light of my understanding of the requirements of Const 1963, art 6, § 6, I also provided an explanation in writing of my decision not to participate and asked that the Court open an administrative file to explore the rules that should govern justice disqualification decisions.[14]

In light of what I discovered during the consideration of *In re JK, supra,* I have since continuously called for this Court to adopt clear, fair, and enforceable

---

[13] Const 1963, art 6, § 6 provides:
> Decisions of the supreme court, including all decisions on prerogative writs, shall be in writing and shall contain a concise statement of the facts and reasons for each decision and reasons for each denial of leave to appeal. When a judge dissents in whole or in part he shall give in writing the reasons for his dissent.

[14] In my statement of nonparticipation in *In re JK, supra,* I also proposed for public comment amendments of MCR 2.003 that would require that a justice publish in the record of the case the reasons for the decision to participate or not participate in the case when the issue of disqualification was raised by a party, the justice himself or herself, or another justice. I further outlined the procedure for a justice to raise his or her potential disqualification with the parties and their attorneys. See *In re JK, supra,* 220-221.

procedures in court rules to govern the participation or disqualification of justices. Despite the importance of the issue, ADM 2003-26 did not receive substantive attention from the majority of four until the fall of 2005, when this case and an unrelated case involving motions for disqualification were before the Court. In addition to respondent's motions in this case, motions to disqualify Chief Justice TAYLOR and Justice MARKMAN were received in *Adair v Michigan*.[15]

ADM 2003-26 was placed on the March 1, 2006, administrative agenda. On April 19, 2006, nearly three years after ADM 2003-26 was opened, the Court voted unanimously to publish three alternative proposals to amend the court rules governing the disqualification of justices. The three proposals were scheduled to be published for public comment on June 15, 2006.[16] However, on June 14, 2006, while this case was still pending, it is a fact that Justice YOUNG without explanation held the proposals from publication. Earlier that day, I had indicated at a Court conference that I would be dissenting in this case.

On July 6, 2006, I circulated the first draft of my dissent in this case explaining why the participation of Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN violated respondent's due process rights.

---

[15] 474 Mich 1027 (2006). See part IV later in this statement.

[16] See appendix A for a discussion comparing the three alternative proposals, appendix B for a summary chart, and appendix C to review the proposals as they were set for publication on June 15, 2006.

Meanwhile, ADM 2003-26 was returned to the administrative agenda for July 12, 2006. On July 11, 2006, in a memorandum to the Court regarding ADM 2003-26, Justice CORRIGAN indicated:

> In light of Justice Weaver's opinion in *Fieger,* I am no longer certain that it is wise to consider tampering with our 169-year tradition of allowing each justice alone to decide whether recusal is warranted.

On the next day, July 12, 2006, the matter of setting a new date for the publication of the proposals was passed by the majority of four.

The decision in this case was released on July 31, 2006. Justice CAVANAGH'S dissenting opinion accurately noted that, at that time, the three alternative proposals from ADM 2003-26 regarding how this Court should handle disqualification motions had been "languishing in this Court's conference room for a substantial period of time."[17] Justice CAVANAGH further stated:

> In the same way I will look forward to the dust settling from the case at bar, I will similarly anticipate this Court's timely attention to the important matter of disqualification motions. I take my colleagues at their word that the issue of disqualification will be handled in a prompt manner in the coming months.[18]

In light of the April 19, 2006, unanimous vote to publish these three proposals, it was understood and expected that they would soon be published.

---

[17] *Grievance Administrator v Fieger,* 476 Mich at 327 n 17 (CAVANAGH, J., dissenting). See also *In re Haley,* 476 Mich 180, 201 n 1 (2006)(CAVANAGH, J., concurring).

[18] *Grievance Administrator v Fieger,* 476 Mich at 327 n 17 (CAVANAGH, J., dissenting).

On August 21, 2006, this Court received respondent's motion for a stay of proceedings in light of his intent to appeal this Court's decision to the United States Supreme Court. When ADM 2003-26 returned to the administrative agenda on September 7, 2006, the majority of four, Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN, voted four to three against a motion to publish the proposals for public comment, and abruptly voted four to three to close the justice disqualification file, ADM 2003-26.[19]

In light of this recent history, it is clear that this Court currently lacks sufficient standards to protect litigants' access to unbiased judicial decision-making, including access by the respondent in this case. It is also clear that the majority of four has no intent to adopt clear, fair, and enforceable procedures in the court rules governing judicial disqualification that would protect litigants' due process rights.

---

[19] The only rationale for the majority's closure of the file, if it can be so termed, was that provided by Justice YOUNG orally during the September 7, 2006, Court administrative conference. Rather than engage the issue under review, he attacked my character in highly offensive, personal terms and stated, with the concurrence of Chief Justice TAYLOR and Justices CORRIGAN and MARKMAN, that the majority of four would "never publish the proposals" on disqualification and would "not give [me] any more power" (whatever that means).

After Justice YOUNG'S baseless and irrelevant assertions, I moved to publish for public comment the three court rule proposals for the disqualification of justices. The motion was seconded, but was defeated by the majority of four in a four (4) to three (3) vote. It was then moved, seconded, and carried by the majority of four by a vote of four (4) to three (3) to close the justice disqualification file, ADM 2003-26.

23

III. Case Law Revealing the Need forReform in the Standards Governing
Justice Disqualification Decisions

Since ADM 2003-26 was opened over three years ago, there have been numerous motions for the disqualification of various justices by parties coming before this Court. Some members of this Court have continued to urge that this Court publicly address the appropriate and lawful procedures for decisions regarding the participation or disqualification of justices.[20] There has also been increasing public recognition in the media of the significance of the issue of judicial disqualification.[21]

Moreover, during the past three years, the four majority justices of the Michigan Supreme Court have sometimes followed unwritten traditions and have

---

[20] See, e.g., statements of WEAVER, J., in *In re JK,* 468 Mich 202, 219 (2003), *Gilbert v DaimlerChrysler Corp,* 469 Mich 883, 889 (2003), and *Advocacy Org for Patients & Providers v Auto Club Ins Ass'n,* 472 Mich 91, 100 (2005), statements of KELLY, J., and WEAVER, J., in *McDowell v Detroit,* 474 Mich 999, 1000 (2006), *Stamplis v St John Health Sys,* 474 Mich 1017, 1018 (2006), *Heikkila v North Star Trucking, Inc,* 474 Mich 1080, 1081 (2006), and *Lewis v St John Hosp,* 474 Mich 1089, 1090 (2006), and statements of CAVANAGH, J., and WEAVER, J. in *Adair, supra* at 1043-1044.

[21] Justices' wives: Questions about conflict of interest can't be ignored, Detroit Free Press, January 25, 2006; David Shepardson, High court justices refuse to step down from cases, The Detroit News, February 1, 2006; Chris Christoff, 2 justices to stay on cases, Detroit Free Press, February 1, 2006; Court conflict, Detroit Free Press, February 1, 2006; Conflicted: Justices' defense of conflict of interest rules reveals weaknesses, Lansing State Journal, February 3, 2006; Justices refuse to disqualify themselves, Michigan Lawyer's Weekly, February 6, 2006; Todd C. Berg, Is it time for MSC to reform how it handles recusal motions?, Michigan Lawyer's Weekly, March 14, 2006. A Michigan Lawyer's Weekly Web poll results show that 80 percent of the Internet users who have chosen to participate voted "yes" on the question whether Justice MICHAEL CAVANAGH'S proposed court rule is necessary, <http://www.milawyersweekly.com/poll/pollresults.cfm?poll=020606MIdisqualify> (accessed March 14, 2006).

sometimes not. At times, they have followed portions of the current court rule on disqualification, MCR 2.003. On a few occasions, the four majority justices have published their reasons for denying a motion for their disqualification consistent with Const 1963, art 6, § 6, which requires that justices of the Michigan Supreme Court give written reasons for all decisions. However, in the vast majority of cases, such as in this case, they have not given written reasons for their decision to deny a motion for their disqualification.

For example, in *Gilbert v DaimlerChrysler Corp*, 469 Mich 883 (2003), the issue whether MCR 2.003 applies to a justice was squarely before the Court. On behalf of the plaintiff, attorney Geoffrey Fieger filed a motion for the disqualification of then-Chief Justice CORRIGAN and Justices WEAVER, TAYLOR, YOUNG, and MARKMAN. Then-Chief Justice CORRIGAN and Justices TAYLOR, YOUNG, and MARKMAN denied the motion without written explanation.[22]

Attorney Fieger then filed a motion for reconsideration of the Court's order denying the motion for disqualification of then-Chief Justice CORRIGAN and Justices TAYLOR, YOUNG, and MARKMAN. In the motion for reconsideration, attorney Fieger asked that one of two procedures be followed: either that the Court as a whole decide the motion for disqualification, or that the procedures in MCR

_____

[22] In response to the motion for my disqualification in *Gilbert, supra*, I followed the procedures of MCR 2.003 that each justice decides the motion for disqualification brought against himself or herself. In accordance with the Michigan Constitution, art 6, § 6, I also gave detailed reasons for my decision not to disqualify myself. *Gilbert, supra*, 469 Mich 883, 883-889.

25

2.003(C)(3) for review of a judge's decision not to disqualify himself or herself be followed. The four challenged justices ignored the requirements of MCR 2.003(C)(3) and simply entered an order denying the motion for reconsideration without any written reasons.[23] The majority of four has similarly failed to provide reasons for its decision to participate in most cases where the disqualification of those in the majority has been requested.[24]

However, in response to respondent's second motion for his disqualification in this case, Justice MARKMAN denied the motion and explained his reasons.[25] Similarly, in *Adair v Michigan*,[26] Chief Justice TAYLOR and Justice MARKMAN relied on MCR 2.003(B)(6) to explain their decisions not to recuse themselves from participating in a case after their spouses' employment in the office of the Attorney General was raised as an issue. In their joint statement, Chief Justice TAYLOR and Justice MARKMAN specifically recognized that they

---

[23] There was no motion for reconsideration of my decision to participate in the case. However, I published a statement that I would have granted the motion for reconsideration "to address the proper procedure for the review of a judge's decision not to recuse himself or herself from a case," pointing out the procedures in MCR 2.003(C)(3). *Gilbert, supra,* 469 Mich 890.

[24] *Graves v Warner Bros,* 669 NW2d 552 (2003), *Gilbert v DaimlerChrysler Corp,* 469 Mich 883 (2003), *Harter v Grand Aerie Fraternal Order of Eagles,* 693 NW2d 381 (2005), McDowell v Detroit, 474 Mich 999 (2006), *Stamplis v St John Health Sys,* 474 Mich 1017 (2006), *Heikkila v North Star Trucking, Inc,* 474 Mich 1080 (2006), and *Lewis v St John Hosp,* 474 Mich 1089 (2006).

[25] Grievance Administrator v Fieger, 475 Mich 1211, 1212 (2006).

[26] 474 Mich 1027(2006)(statement by TAYLOR, C.J., and MARKMAN, J.).

were required to comply with MCR 2.003, stating that "[p]ursuant to MCR 2.003(B)(6), we would each disqualify ourselves if our respective spouses were participating as lawyers in this case, *or if any of the other requirements of this court rule were not satisfied.*" 474 Mich 1043. (Emphasis added.)

Justice YOUNG concurred with Chief Justice TAYLOR and Justice MARKMAN'S joint statement in *Adair,* saying that he supported their assertions and fully concurred in the legal analysis of the ethical questions presented in it. Thus, at that time, Justice YOUNG apparently agreed that MCR 2.003 applied to justice disqualification decisions. In addition to Chief Justice TAYLOR and Justices MARKMAN and YOUNG'S recognition of the applicability of MCR 2.003 to justices, in *Grosse Pointe Park v Michigan Muni Liability & Prop Pool,* 473 Mich 188 (2005), then-Chief Justice CORRIGAN applied the remittal of disqualification process of MCR 2.003(D) when deciding whether to disqualify herself.

This Court's helter-skelter approach to the applicability of MCR 2.003 and to the constitutional requirement that reasons be given for decisions to participate despite a challenge is unacceptable. The lack of clear, fair, and enforceable procedures in court rules when deciding motions for disqualification violates litigants' due process rights.

As Justice CAVANAGH observed in his statement of nonparticipation in *Adair, supra* at 1043, "Currently, our court rules do not address disqualification of

27

a justice of this Court. I am now persuaded that minimal due process concerns demand that they should."[27]

## IV. Recent Case Law Lowers the Standards Governing Justice Disqualification Decisions

The majority of four's helter-skelter approach to motions for their disqualification and their decision to close the justice disqualification file, ADM 2003-26, are facts made more significant and damaging to the judiciary by recent decisions relevant to the standards governing justice disqualification.

For example, in *In re Haley, supra,* the majority of four trivialized one of the most fundamental standards that govern judicial conduct, the appearance of impropriety standard. Canon 2(A) of the Michigan Code of Judicial Conduct provides:

> Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety.

However, the majority of four concluded in July 2006 in *In re Haley, supra* at 200, that the appearance of impropriety standard was a mere tool of an "evolving sense of conscience" and, thus, allegedly subject to abuse. Accordingly, the majority of four refused to apply the appearance of impropriety standard when imposing discipline for misconduct in *In re Haley.* Chief Justice TAYLOR and

---

[27] Justice CAVANAGH'S proposed amendment of MCR 2.003 is published in *Adair, supra* at 1043-1044.

28

Justice MARKMAN also refused to apply the appearance of impropriety standard to the motion for their disqualification in *Adair, supra*.

In contrast, the majority of four fully supported the appearance of impropriety standard until the four themselves were challenged for the appearance of impropriety created by their own conduct during their campaigns for reelection and for the employment of Chief Justice TAYLOR'S and Justice MARKMAN'S respective spouses by the Michigan Attorney General. As I noted in my concurrence in *In re Haley, supra* at 209, just six years ago in *In re Brown*, 461 Mich 1291 (2000), the majority of four included the appearance of impropriety standard within the factors that the Judicial Tenure Commission must now consider to help ensure that "equivalent misconduct is treated equivalently."

The majority's perspective on the appearance of impropriety has deteriorated from its being necessary to ensuring the application of consistent standards to judicial misconduct, to its being a "vagary" that "countermands" other more specific court rules or canons of judicial conduct. *In re Haley, supra* at 194.

In another recent case, *Adair v Michigan*, 474 Mich 1027, 1040-1041 (2006), the majority of four lowered the threshold for a justice's participation when faced with a motion for disqualification. In *Adair, supra*, the plaintiff moved for the disqualification of Chief Justice TAYLOR and Justice MARKMAN. The Michigan Attorney General's office was representing the defendant. Chief Justice TAYLOR'S and Justice MARKMAN's spouses' employment by the Michigan Attorney General's office formed the grounds for the disqualification motions.

In *Adair, supra* at 1040-1041. Chief Justice TAYLOR and Justice MARKMAN asserted that they had a "duty to sit" similar to that which has been applied to United States Supreme Court justices. Justices CORRIGAN and YOUNG endorsed Chief Justice TAYLOR and Justice MARKMAN'S argument. This new consideration that the majority of four would impose upon a Michigan Supreme Court justice's disqualification decision unnecessarily tips the scales in favor of participation despite an alleged impropriety that participation might create.

Although I agree that a justice should participate whenever appropriate, I disagree that the "duty to sit" rationale justifies the participation of a justice when his or her participation creates an appearance of impropriety. Neither the Michigan Constitution nor the Michigan Court Rules justify the majority of four's rationale in *Adair, supra*.[28]

The standards governing justice disqualification decisions should not be subject to change and manipulation through a series of complex adjudicated cases, but should be constant and easily accessible to anyone who needs to understand

---

[28] Art 6, § 23 of the Michigan Constitution as amended in 1968 granted this Court the *discretionary* power to "authorize persons who have been elected and served as judges to perform judicial duties for limited periods or specific assignments." As I stated in *Adair, supra,* this power allows (but does not require) this Court to provide for the temporary replacement of a justice who recuses himself or herself or who is disqualified from a case. On the other hand, the constitution does not require that every decision of the Court be made by seven justices and MCR 7.316(C) indicates that a decision of this Court only requires a concurrence of a "majority of justices voting." The court rule anticipates that decisions can be made by fewer than seven justices.

them in a court rule that is clear, fair, and enforceable after public comment and public hearing on the proposed rules.

## V. Response to the "Deliberative Process"

Contrary to Justice MARKMAN'S assertion, my dissent does not reveal a single predecisional deliberation regarding an adjudicated case. My dissent does, however, outline important facts regarding the disposition of a now-closed administrative file of this Court, ADM 2003-26. This Court has both adjudicative responsibilities and administrative responsibilities.

No Michigan case establishes a judicial deliberative privilege, nor does any Michigan statute or court rule. Justice MARKMAN has not identified any law that requires a justice to be forever silent regarding the handling of administrative matters. In fact, quite the contrary is true. Canon 3(B) of the Code of Judicial Conduct addresses a judge's performance of his or her *administrative responsibilities*. Canon 3(B)(1) provides:

> A judge should diligently discharge administrative responsibilities, maintain professional competence in judicial administration, and facilitate the performance of the administrative responsibilities of other judges and court officials.

To "facilitate the performance of the administrative responsibilities of other judges and court officials," it may at times be necessary for a justice to inform the public of the Court's mishandling of its administrative responsibilities. This is such a time.

31

Nor is there any law requiring permanent silence regarding the Court's deliberations on cases. A judicial deliberative privilege, as it exists in Michigan, is articulated within the canons of the Michigan Code of Judicial Conduct. It is this judicial privilege that I have understood for my entire 32-year judicial career, and by which I strive to abide. Regarding public comment on "adjudicative responsibilities," Canon 3(A)(6) of the Code of Judicial Conduct provides:

> A judge should abstain from public comment about a *pending or impending* proceeding in any court, and should require a similar abstention on the part of court personnel subject to the judge's direction and control. This subsection does not prohibit a judge from making public statements in the course of official duties or from explaining for public information the procedures of the court or the judge's holdings or actions. [Emphasis added.]

Canon 3(A)(6) thus recommends against a judge speaking with regard to a case that is pending or impending in any court; however, Canon 3(A)(6) does not absolutely prohibit comment on such cases.[29]

Beyond the longstanding restriction imposed by Canon 3(A)(6) of the Code of Judicial Conduct, on November 13, 2006 during an unscheduled executive session from which Court staff were excluded, the majority of four adopted an Internal Operating Procedure (IOP)——a secret "gag rule"—— attempting to *forever forbid* a justice from publicly revealing "memoranda and conference discussions regarding cases or controversies on the CR and opinion agendas . . .

---

[29] To abstain is "[t]o refrain from something by one's own choice." Webster's New World Dictionary, Second College Edition (1982).

32

.”[30] Moreover, at the close of the November 29, 2006, conference, it was moved, seconded, and tabled that a slightly edited version of the new secret "gag rule" be adopted as an emergency court rule having immediate effect, without notice or public comment before its adoption.

I am guided by the fact that, as a justice, I am accountable first and foremost to the public. The public expects to be informed by a justice if something is seriously wrong within the operations of the Court. How else would the public know and be able to correct the problem through the democratic and constitutional processes? The public rightly expects the justices of this Court to act with courtesy, dignity, and professionalism toward one another. In matters of principle and legitimate public concern, however, the public does not expect a justice to "go along to get along." The public trusts, or should be able to trust, that

---

[30] The majority of four, Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN, voted to adopt the IOP/secret "gag rule." Justices CAVANAGH and KELLY abstained. I voted against the IOP/secret "gag rule." The new IOP/secret "gag rule" provides:

> All memoranda and conference discussions regarding cases or controversies on the CR and opinion agendas are confidential. This obligation to honor confidentiality does not expire when a case is decided. The only exception to this obligation is that a Justice may disclose any unethical or criminal conduct to the Judicial Tenure Commission or proper law enforcement authority.

the justices of this Court will not transform the Court into a secret society by making rules to protect themselves from public scrutiny and accountability.

Yet the public does not expect, and likely would not tolerate, being informed every time a justice changes positions on a matter before the Court, or every time a justice loses his or her temper with a colleague. The public expects justices to debate frankly, to be willing to change positions when persuaded by better argument, and to be willing to admit that they have changed their position. Moreover, momentary, human imperfections do not affect the work of the Court. The public would lose patience with and not support a justice who recklessly and needlessly divulged such information for intemperate or political reasons.

The public expects that justices will exercise wise and temperate discretion when disclosing information regarding the operations of the Court and the justices' performance of their duties. It is an elected or appointed justice's compact with the people that, whenever possible, he or she will make all reasonable efforts to correct problems in the Court from within.

But the public does need to know, and expects to be informed by a justice, when repeated abuses of power and/or repeated unprofessional conduct influence the decisions and affect the work of their Supreme Court. I believe it is my duty and right to inform the public of such repeated abuses and/or misconduct if and when they occur.

I recognize that there is a federal judicial deliberative privilege of <u>uncertain scope</u> in federal common law, but that is not Michigan law and is not binding on

this Court. Moreover, the deliberative privilege articulated in federal law does not prevent a justice from speaking out regarding matters of legitimate public concern. *Pickering v Bd of Ed*, 391 US 563 (1968).

The federal deliberative privilege is narrowly construed and qualified. The privilege is not intended to protect justices, but rather operates to protect the public confidence in the integrity of the judiciary. For such public confidence to be warranted, this Court must be orderly and fair and must act with integrity, professionalism, and respect. By contrast, the majority's new secret "gag rule" is specifically designed to prevent public access to information that would allow the public to hold each justice accountable for the performance of his or her duties.

In a pertinent federal case, the Fifth Circuit Court of Appeals addressed whether a judge could be reprimanded for publicly commenting on the administration of justice as it related to a case in his court. *Scott v Flowers,* 910 F2d 201 (CA 5, 1990). The court cited *Pickering, supra,* in recognition that the deliberative privilege could not prevent the judge from truthfully speaking out regarding matters of legitimate public concern where the judge's First Amendment rights outweighed the government's interest in promoting the efficient performance of its function.

In light of *Pickering, supra*, the *Scott* court concluded:

> Neither in its brief nor at oral argument was the Commission able to explain precisely how Scott's public criticisms would impede the goals of promoting an efficient and impartial judiciary, and we are unpersuaded that they would have such a detrimental effect. Instead, we believe that those interests are ill served by casting a

cloak of secrecy around the operations of the courts, and that by bringing to light an alleged unfairness in the judicial system, Scott in fact furthered the very goals that the Commission wishes to promote. [*Id.* at 213.]

The *Scott* court thus held that the judge could not constitutionally be reprimanded for making public statements critical of the court.

The federal deliberative privilege as defined in the federal common law does not extend to every utterance and action within the Court's conferences and communications. It does not protect actions taken on nonadjudicative matters involving administrative responsibilities. It also does not extend to actions or decisions of the Court, because the actions and decisions of the Court are not *deliberations*, they are *facts* that occur at the end of a deliberative period.

Further, any judicial privilege does not extend to repeated resort to personal slurs, name calling, and abuses of power, such as threats to exclude a justice from conference discussions, to ban a justice from the Hall of Justice, or to hold a dissenting justice in contempt. Nor should it extend to conduct such as refusing to meet with justices on the work of the Court as the majority of four have now twice done on November 13 and November 29, 2006. The privilege certainly does not extend to illegal, unethical, and improper conduct. Abuses of power and grossly unprofessional conduct are entirely unrelated to the substantive, frank, and vigorous debate and discussion of pending or impending adjudicated cases that a properly exercised judicial privilege should foster. Like all privileges, a judicial privilege can be waived.

An absolute judicial privilege (ancient or newly created) that members of this Court allege exists is not written in Michigan law. Perhaps, further attempts to define the scope of the judicial privilege in Michigan may or may not be warranted. However, the privilege cannot effectively be expanded beyond that expressed within the Code of Judicial Conduct through the recent adoption of the IOP/secret "gag rule." Nor should the new IOP/secret "gag rule" be adopted as an "emergency" court rule.

If the Court embarks on an attempt to further define the judicial deliberative privilege, it should do so by opening an administrative file on the issue and by inviting public comment before making any such decision. After all, any judicial deliberative privilege must serve the public's interest in maintaining an efficient and impartial judiciary, not the justices' personal interests in concealing conduct that negatively and seriously affects the integrity and operations of the Court. The public must, therefore, have a voice in defining the boundaries of any expanded deliberative privilege.

Moreover, any judicial privilege defined in any rule must not infringe on a justice's constitutional duties and rights. Const 1963, art 6, § 6 requires:

> When a judge dissents in whole or in part he shall give in writing the reasons for his dissent.

Any new court rule on deliberations that would force a dissenter to not include in his or her dissent any or all of his or her reasons would interfere with

the dissenter's duty under art 6, § 6. In effect, such a rule would allow the majority to write the dissent and would be unconstitutional.

In my opinion, the majority of four mishandled the justice disqualification file. For over nine (9) months, dating back to March 1, 2006, Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN have delayed action on, and thus publication of, the Court's minutes, and the dissents to the substance of those minutes, for critical administrative conferences involving the justice disqualification file, ADM 2003-26. Specifically, they have failed to act on the proposed March 1, 2006, minutes and to publish the minutes approved on September 7, 2006, because I have dissented to the substance of the minutes proposed for March 1, 2006, to the minutes for several of the dates approved on September 7, 2006, and to the September 7, 2006, action in closing the file on justice disqualification, ADM 2003-26.[31] Moreover, they have abruptly closed the file despite the overwhelming evidence of the need for reform.

Because there is a relationship between the majority of four's handling of the justice disqualification file and the disposition of this case, the fair administration of justice by this Court is at stake. The mishandling of the disqualification file has, coincidently or not, occurred during the period that this case, which involves several motions to disqualify members of the majority of

---

[31] But it is not necessary to reveal substantive conference discussions or debate to demonstrate how the justice disqualification file has been mishandled.

four, was pending before this Court. My silence on these matters would be more damaging to this institution than my speaking out, because I believe it is my duty and right to do so.

Finally, Justice MARKMAN engages unjustifiable speculation by suggesting that I make notes during conference discussions "for the purpose of publicly disclosing" discussion or debate among the justices. I do keep notes during this Court's conferences. My note-taking permits me to better respond to and track the myriad issues that arise on cases and administrative matters that this Court addresses.

## VI. Conclusion

I dissent from the majority of four's decision to deny respondent's motion for a stay of proceedings for the reasons stated in this statement.

I strongly encourage the public (citizens, judges, attorneys, and the media) to carefully review the three proposals as well as the current court rule, MCR 2.003. One thing is clear, the majority of four's continued reliance on the unwritten and often-secret "traditions" of this Court concerning justice disqualification will not ensure consistency, fairness, or due process. It surely has not in this case.

Among the rules that should be adopted to govern justice disqualification decisions is the requirement that a justice give reasons in writing when deciding to disqualify, or not to disqualify, himself or herself when the issue is raised in a

case. It is past time to let some sunshine in to show how this Court conducts the people's business, and to end the movement toward greater secrecy and less accountability that this majority advances.

The public needs to have information on how the justices conduct the people's judicial business in order to assess the justices' performance of their duties and to hold the justices accountable. An efficient and impartial judiciary is "ill served by casting a cloak of secrecy around the operations of the courts...."[32]

---

[32] *Scott v Flowers,* 910 F2d 201, 213 (CA 5, 1990).

Appendix A: The Abandoned Proposals for New Court Rules Governing
Justice Disqualification

While the majority of four has voted to close the justice disqualification file, ADM 2003-26, public discussion of the important issue of the rules that should govern justice disqualification decisions remains necessary. The public is entitled to study the proposals so that it can understand and encourage the adoption of critically needed rules governing the participation or disqualification of justices in pending cases. Therefore, I have included the three proposals below.

Because the differences between the proposed amendments to the court rules are complicated, the following is a list of pertinent questions and commentary to facilitate the discussion of the alternative proposals. Also attached as appendix B is a chart summarizing the distinctions between the alternative amendments. Public input is necessary at this time to ensure the independence and integrity of the judiciary and to restore the public's trust and confidence in the Michigan Supreme Court.

(1)     *What form should a rule on the disqualification of Michigan Supreme Court justices take?*

Currently, justices of the Michigan Supreme Court sometimes follow unwritten traditions, not always known even to all the justices, when deciding a motion for disqualification. At other times, justices follow portions of the current

41

court rule on disqualification, MCR 2.003. This helter-skelter approach of following "unwritten traditions" that are secret from the public is wrong because it violates the due process guarantees of the Fifth and Fourteenth amendments. There should be clear, fair, and enforceable court rules concerning the participation or disqualification of justices.

The three alternative proposed rules are either amendments of or additions to the Michigan Court Rules. Alternatives A and B are new court rules. Alternative C is an amendment of the current court rule governing the disqualification of judges, MCR 2.003.

(2) *Should the list of grounds for disqualification be exclusive or nonexclusive?*

The current court rule, MCR 2.003, provides that the grounds for disqualification listed in the rule are not exclusive. MCR 2.003 states that a judge is disqualified when he or she cannot impartially hear a case, *"including but not limited to"* instances covered by the specific grounds listed. (Emphasis added.)

Alternative C, like the current court rule, MCR 2.003, makes the list of grounds for disqualification *nonexclusive*, stating that "[d]isqualification of a judge is warranted for reasons *that include, but are not limited to,* the following . . . ."

By contrast, both alternatives A and B restrict the possible grounds for disqualification of justices to those on the *exclusive* list in the proposed rule.

42

Alternative A not only provides an exclusive list of grounds for disqualification, it also specifies that "[u]nless one of the conditions specified below is met, it is the duty of a justice to serve in every case and a justice is not mandatorily required to withdraw from serving on a case."

(3) *Should there be a rule that a justice is disqualified when he or she cannot impartially decide a case?*

The current court rule, MCR 2.003(B), provides that a judge is "disqualified when the judge cannot impartially hear a case . . . ."

Alternative A entirely omits this language, thus narrowing the grounds for disqualification.

Alternatives B and C heighten the impartiality standard of MCR 2.003 by stating that disqualification of a judge, including a justice, is warranted whenever the judge's "impartiality might objectively and reasonably be questioned." This language is taken from the federal rules, and has been interpreted as meaning whether "an objective, disinterested observer fully informed of the facts underlying the grounds on which [disqualification] was sought would entertain a significant doubt that justice would be done in the case." *Pepsico, Inc v McMillen*, 764 F2d 458, 460 (CA 7, 1985).

(4) *Does the proposed rule require or permit a justice to explain his or her decision whether or not to recuse himself or herself, and does it require or permit other justices to dissent?*

43

Article 6, § 6 of the 1963 Michigan Constitution states that "[d]ecisions of the supreme court . . . shall be in writing and shall contain a concise statement of the facts and reasons for each decision . . . ."

Consistently with Const 1963, art 6, § 6, alternative C requires that a justice's decision and reasons to deny a motion for his or her disqualification be in writing. Further, when the full Court reviews a justice's decision to deny a motion for disqualification, in obedience to art 6, § 6, alternative C requires the Court to include the reasons for its grant or denial of the motion for disqualification.

By contrast, alternatives A and B do not require a written explanation of a justice's decision to deny a motion for his or her disqualification. In fact, alternative B *forbids* statements by any justice when the full Court reviews a justice's decision to deny a motion for his or her disqualification.

(5)     *Should bias and prejudice against an attorney in a proceeding be a ground for disqualification?*

Alternatives A and B omit a provision found in both the current version of MCR 2.003 and alternative C that disqualification is warranted if the judge is biased or prejudiced for or against an *attorney* in the proceeding.     Under alternative A, disqualification of a justice is required or warranted only if the justice "is actually biased against or for a *party* in the proceeding."     Under

44

alternative B, disqualification is warranted only if the justice "is actually biased or prejudiced against or for a *party* in the proceeding."

It is an important question whether bias and prejudice against an *attorney* in a proceeding are as serious of a concern as bias and prejudice against a *party* in a proceeding.

(6)    *Should there be an opportunity for review of a justice's decision not to recuse himself or herself?*

Under MCR 2.003(C)(3), the party moving for a judge's disqualification can ask for review of that judge's decision to deny the motion. In a court having two or more judges, MCR 2.003(C)(3)(a) provides for review de novo by the chief judge of the court. In a single-judge court, or when the challenged judge is the chief judge, MCR 2.003(C)(3)(b) provides for review de novo by another judge assigned by the State Court Administrator.

Alternative C amends MCR 2.003(C)(3) to provide that the entire Supreme Court may review a justice's decision to deny a motion for his or her disqualification.

Alternative B allows for limited review of a justice's decision by the Chief Justice, or by the entire Court if the challenged justice is the Chief Justice. However, as noted above, alternative B prohibits any statement or dissent in connection with the Court's decision to affirm or reverse a justice's decision to deny the motion for his or her disqualification. A question arises whether this

45

prohibition violates Const 1963, art 6, § 6, which requires that all decisions of the Supreme Court, and all dissents by a justice, shall be in writing and shall include the reasons for the decision or the dissent.

Alternative A does not provide for any review of a justice's decision not to recuse himself or herself. Failing to provide for any review raises the question whether a person accused of bias and prejudice can be trusted to recognize the existence of his or her own bias and prejudice.

(7) *Is there a "duty to sit" applicable to Michigan Supreme Court justices?*

Alternative A asserts that a justice has a duty to "serve in every case" unless one of the exclusive grounds for disqualification enumerated in alternative A exists. Neither the Michigan Constitution nor the Michigan Court Rules impose a "duty to sit."[33]

The Michigan Constitution anticipates that a justice may be unable to sit in a case. Article 6, § 23, as amended in 1968, grants the Supreme Court the discretionary power to "authorize persons who have been elected and served as judges to perform judicial duties for limited periods or specific assignments." This provision does not distinguish among, but rather addresses all, "judicial duties" performed by judges and justices in Michigan. Moreover, nothing in the

---

[33] Alternative A's "duty to sit" rationale was first publicly articulated in Chief Justice TAYLOR and Justice MARKMAN'S written explanation, concurred in by Justices CORRIGAN and YOUNG, of their decision to participate in *Adair v Michigan,* 474 Mich 1027, 1040-1041 (2006). In my *Adair* statement, I explained that there is no justification to impose the federal "duty to sit" doctrine on Michigan Supreme Court justices. *Adair, supra* at 1044-1045.

constitutional provision would preclude this Court from exercising its art 6, § 23 discretionary authority to fill a temporary vacancy created by a justice's disqualification from a case.

The text of art 6, § 23 expressly limits whom this Court may authorize to perform judicial duties to "persons who have been elected and served as judges . . . ."[34] It also provides that such authorizations must be for "limited periods or specific assignments." Thus, the 1968 amendment of art 6, § 23 allows this Court to ensure that judicial duties do not go unperformed, but it does not *require* this Court to exercise this authority.

Similarly, the court rules anticipate that not every justice will participate in every case. MCR 7.316(C) permits fewer than seven justices to render a decision of the Court, providing simply that "a decision of the Supreme Court must be made by concurrence of a majority of the justices voting." MCR 7.316(C) also permits "affirmance of action by a lower court or tribunal by even division of the justices . . . ."

(8) *Should a justice be allowed to raise the issue of another justice's disqualification without filing a motion or an affidavit?*

_____

[34] Persons who have been "elected and served as judges" have already taken an oath of judicial office. Thus, the grant of discretionary authority in art 6, § 23 to the Supreme Court to "authorize persons" who have been elected and have served as judges to perform "judicial duties" is not a grant of an appointment power.

47

Under alternative B, a justice could secretly raise the issue of a fellow justice's disqualification with no notice to the parties, no motion filed in the record, and no affidavit filed. Currently, when a justice has doubts about the propriety of a fellow justice's participation in a particular case, guidance is found in the Code of Judicial Conduct. Canon 3(B)(3) suggests that a justice can "take or initiate appropriate disciplinary measures against a judge or lawyer for unprofessional conduct of which the judge may become aware."

The current court rule, MCR 2.003, requires that any party to a case wishing to raise a judge's disqualification must do so by motion[35] and that an affidavit must accompany the motion.[36] But under alternative B, a justice, who is not a party to the case, would be allowed to raise the issue without filing a motion. Neither the parties nor the public would know that one justice had raised the issue of another justice's disqualification in a case. Further, the challenging justice is not required by alternative B to file an affidavit supporting the motion, because subsection C(2) of alternative B only requires that an affidavit be filed with a *motion* for disqualification, and in alternative B no motion is required for one justice to challenge another justice's participation.

---

[35] MCR 2.003(A).

[36] MCR 2.003(C)(2).

48

(9)    *Should a party or an attorney be precluded from bringing a motion for disqualification based on statements by a justice when those statements are made during an election campaign?*

There is currently no reference to or special protection for campaign speech in the current court rule, MCR 2.003, nor is any such special protection proposed in alternative A or C.

However, alternative B excludes "campaign speech" from consideration in assessing a justice's impartiality.    Alternative B states that "campaign speech protected by *Republican Party of Minnesota v White,* 536 US 765 (2002), [shall not] be a proper basis for the disqualification of a justice."

Judicial candidates enjoy the right to free speech, and a judicial candidate has the right to state his or her views on a subject.  Nevertheless, the Due Process Clause also requires that litigants have access to an unbiased and impartial decision maker.[37]  Highly political and polarizing campaign speech by a judicial candidate or the candidate's campaign committee may raise legitimate questions regarding a justice's ability to impartially decide a case.[38]

---

[37] *Johnson v Mississippi,* 403 US 212 (1971); *Tumey v Ohio,* 273 US 510 (1927); *Crampton v Dep't of State,* 395 Mich 347, 351 (1975);  *Talbert v Muskegon Constr Co,* 305 Mich 345 (1943).

[38]Republican Party of Minnesota v White, 536 US 765 (2002).

*(10) Should disqualification based on a spouse's or relative's participation in a case be limited to cases in which the spouse or relative is the lawyer "of record"?*

Alternative B lowers the standard regarding motions for disqualification of a justice for possible familial[39] bias or influence. MCR 2.003 requires that a judge be disqualified whenever a family member is acting as a lawyer in a case. Alternative B provides that disqualification of a justice is required when the familial member is acting as a lawyer "of record" in the proceeding.

This proposed change from MCR 2.003(B)(6) would affect the outcome of cases such as *Adair, supra*, in which the plaintiff requested the disqualification of Chief Justice TAYLOR and Justice MARKMAN.[40] The proposed new rule would preclude challenges such as the one made in *Adair* unless a justice's spouse is the "lawyer of record" in the case.

---

[39] Bias or influence would be "familial" if it involves "the justice's spouse, or a person within the third degree of relationship to either [the justice or the spouse], or the spouse of such a person . . . ." MCR 2.003(B)(6).

[40] Chief Justice TAYLOR'S wife and Justice MARKMAN'S wife are lawyers employed by the Michigan Attorney General's office. Sharing a household and sharing income with a spouse who was given an at-will job by a public official whose office regularly appears before the Court formed the basis for the motion for disqualification filed against Chief Justice TAYLOR and Justice MARKMAN in *Adair, supra*.

(11) *Should the time limit for filing a motion for disqualification be shortened to 14 days after the grounds for disqualification should have been discovered?*

Alternatives B and C add a new constraint to the time within which a motion for disqualification must be filed. Alternatives B and C provide that such motions must be filed within 14 days after the moving party *"should have discovered"* the ground for disqualification. The existing court rule, MCR 2.003(C)(1), does not impose this heightened time constraint.

Appendix B:  Comparison Chart

| | Alternative RULE A | Alternative RULE B | Alternative RULE C | MCR 2.003 |
|---|---|---|---|---|
| (1) What form does the proposed rule take? | New court rule | New court rule | Amendment of MCR 2.003 | --- |
| (2) Is the list of grounds for disqualification exclusive or nonexclusive? | Exclusive | Exclusive | Nonexclusive | Non-exclusive |
| (3) Is there a rule that a justice is disqualified when he or she cannot impartially decide a case? | No | Yes | Yes | Yes |
| (4) Are reasons for a justice's decision whether or not to recuse himself or herself required or permitted? | Not required | Not permitted | Required | Not required |
| (5) Is bias or prejudice against an attorney in a proceeding a ground for disqualification? | No | No | Yes | Yes |
| (6) Is there opportunity for review of a justice's decision not to recuse himself or herself? | No | Yes | Yes | Yes |
| (7) Is there a special "duty to sit" imposed on justices? | Yes | No | No | No |
| (8) Can a justice raise the issue of disqualification of another justice without filing a motion or an affidavit? | No | Yes | No | No |
| (9) Can a motion for disqualification be based on campaign speech? | Yes | No | Yes | Yes |
| (10) Are the grounds for disqualification when the justice is related to a lawyer in a case limited to when the relative is the lawyer "of record"? | No | Yes | No | No |
| (11) Is the time for filing a motion shortened to 14 days after the grounds *should have been* discovered? | No | Yes | Yes | No |

Appendix C: The Three Abandoned Proposals for Reforming Justice
Disqualification Rules

ALTERNATIVE A (proposed new Rule 2.003-SC
of the Michigan Court Rules)

Rule 2.003-SC        Disqualification of a Justice

Unless one of the conditions specified below is met, it is the duty of a justice to serve in every case and a justice is not mandatorily required to withdraw from serving on a case. Each justice shall, on motion or sua sponte, decide whether grounds exist for his or her disqualification in a particular case. Disqualification of a justice is required if:

(1)    The justice is actually biased against or for a party in the proceeding.

(2)    The justice has personal knowledge of disputed evidentiary facts concerning the proceeding.

(3)    The justice has been consulted or employed as an attorney in the matter in controversy.

(4)    The justice was a partner of a party, attorney for a party, or a member of a law firm representing a party within the preceding two years.

(5)    The justice knows that he or she, individually or as a fiduciary, or the justice's spouse, parent, or child wherever residing, or any other member of the justice's family residing in the justice's household, has a more than de minimis economic interest in the subject matter in controversy or is a party to the proceeding or has any other more than de minimis interest that could be substantially affected by the proceeding.

(6)    The justice or the justice's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(a)     is a party to the proceeding, or an officer, director, or trustee of a party;

(b)     is acting as a lawyer in the proceeding;

(c)     is known by the justice to have a more than de minimis interest that could be substantially affected by the proceeding; or

(d)     is to the justice's knowledge likely to be a material witness in the proceeding.

A justice is not disqualified merely because the justice's former law clerk is an attorney of record for a party in an action that is before the justice or is associated with a law firm representing a party in an action that is before the justice.

### ALTERNATIVE B (proposed new Rule 2.003-SC of the Michigan Court Rules)

Rule 2.003-SC     Disqualification of a Justice

(A)     Who May Raise.  A party may raise the issue of a justice's disqualification by motion, or any justice may raise it.

(B)     Grounds for Disqualification.  Disqualification of a justice is warranted if:

(1)     The justice is actually biased or prejudiced against or for a party in the proceeding.

(2)     The justice's impartiality might objectively and reasonably be questioned.  Statements or conduct by anyone other than the justice shall not be considered in assessing the impartiality of a justice, nor shall campaign speech protected by *Republican Party of Minnesota v White,* 536 US 765; 122 S Ct 2528; 153 L Ed 2d 694 (2002), be a proper basis for the disqualification of a justice.

(3)     The justice has personal knowledge of disputed evidentiary facts concerning the proceeding.

(4)     The justice has been consulted or employed as an attorney in the matter in controversy.

(5) The justice was a partner of a party, attorney for a party, or a member of a law firm representing a party within the preceding two years.

(6) The justice knows that he or she, individually or as a fiduciary, or the justice's spouse, parent, or child wherever residing, or any other member of the justice's family residing in the justice's household, has a more than de minimis economic or other interest in the subject matter in controversy.

(7) The justice or the justice's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(a) is a party to the proceeding, or an officer, director, or trustee of a party;

(b) is acting as a lawyer of record in the proceeding;

(c) is known by the justice to have a more than de minimis interest that could be substantially affected by the proceeding; or

(d) is to the justice's knowledge likely to be a material witness in the proceeding.

A justice is not disqualified merely because a former law clerk of the justice is an attorney of record for a party in an action that is before the Court or is associated with a law firm representing a party in an action that is before the Court.

(C) Procedure.

(1) *Time for filing.* A party must file a motion to disqualify a justice within 14 days after the moving party discovers or should have discovered the basis for disqualification. If a motion is not timely filed, untimeliness is a factor in deciding whether the motion should be granted. A justice may raise a question of disqualification at any time a potential justification for so doing arises.

(2) *All grounds to be included; Affidavit.* In any motion under this rule, the moving party must include all grounds for disqualification that

are known at the time the motion is filed. An affidavit must accompany the motion.

(3)     *Ruling.* The challenged justice shall decide the motion for disqualification. If the challenged justice denies the motion for disqualification, the moving party may appeal to the Chief Justice, who shall decide the motion de novo. If the challenged justice is the Chief Justice, and the motion for disqualification is denied, the moving party may appeal to the entire Court, which shall decide the motion de novo.

(4)     *Motion Denied.* If the Chief Justice denies the motion for disqualification, the Chief Justice shall issue an order to that effect without elaboration. If the challenged justice is the Chief Justice, and the Court denies the motion for disqualification, the Court shall issue a denial order without elaboration. No other additional statements are permitted.

(5)     *Motion Granted.* When a justice is disqualified, the proceeding will be decided by the remaining justices of the Court.

ALTERNATIVE C  (proposed amendment of MCR 2.003)

Rule 2.003   Disqualification of Judge

(A)     Applicability. This rule applies to all judges, including justices of the Michigan Supreme Court, unless a specific provision is stated to apply only to judges of a certain court. The word "judge" includes a justice of the Michigan Supreme Court.

(BA)     Who May Raise. A party may raise the issue of a judge's disqualification by motion, or the judge may raise it.

(C̲B̶) Grounds. ~~A judge is disqualified when the judge cannot impartially hear a case, including but not limited to instances in which:~~

(1) Disqualification of a judge is warranted for reasons that include, but are not limited to, the following:

(a̲1̶) The judge is actually̲p̶e̶r̶s̶o̶n̶a̶l̶l̶y̶ biased or prejudiced for or against a party or attorney.

(b) The judge's impartiality might objectively and reasonably be questioned.

(c̲2̶) The judge has personal knowledge of disputed evidentiary facts concerning the proceeding.

(d̲3̶) The judge has been consulted or employed as an attorney in the matter in controversy.

(e̲) The judge was a partner of a party, attorney for a party, or a member of a law firm representing a party within the preceding two years.

(f̲5̶) The judge knows that he or she, individually or as a fiduciary, or the judge's spouse, parent, or child wherever residing, or any other member of the judge's family residing in the judge's household, has a̶n̶ more than de minimis economic or other interest in the subject matter in controversy. ~~or in a party to the proceeding or has any other more than de minimis interest that could be substantially affected by the proceeding.~~

(g̲6̶) The judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

(i̲a̶) is a party to the proceeding, or an officer, director, or trustee of a party;

(ii̲b̶) is acting as a lawyer in the proceeding;

(iii̲e̶) is known by the judge to have a more than de minimis interest that could be substantially affected by the proceeding; or

(iv~d~) is to the judge's knowledge likely to be a material witness in the proceeding.

(2) Disqualification of a judge is not warranted.~A judge is not disqualified~ merely because the judge's former law clerk is an attorney of record for a party in an action that is before the judge or is associated with a law firm representing a party in an action that is before the judge.

(D~C~) Procedure.

(1) *Time for Filing.* To avoid delaying trial and inconveniencing the witnesses or delaying the appellate process, a motion to disqualify must be filed within 14 days after the moving party discovers or should have discovered the ground for disqualification. In the trial court, if~If~ the discovery is made within 14 days of the trial date, the motion must be made forthwith. If a motion is not timely filed, untimeliness, including, in the trial court, delay in waiving jury trial, is a factor in deciding whether the motion should be granted.

(2) *All Grounds to be Included; Affidavit.* In any motion under this rule, the moving party must include all grounds for disqualification that are known at the time the motion is filed. An affidavit must accompany the motion.

(3) *Ruling.*

(a) For courts other than the Supreme Court, ~T~the challenged judge shall decide the motion. If the challenged judge denies the motion,

(i~a~) in a court having two or more judges, on the request of a party, the challenged judge shall refer the motion to the chief judge, who shall decide the motion de novo;

(ii~b~) in a single-judge court, or if the challenged judge is the chief judge, on the request of a party, the challenged judge shall refer the motion to the state court administrator for assignment to another judge, who shall decide the motion de novo.

(b) In the Supreme Court, if a justice's participation in a case is challenged by a written motion or if the issue of participation

58

is raised by the justice himself or herself, the challenged justice shall decide the issue and publish his or her reasons about whether to participate.

If the challenged justice denies the motion for disqualification, a party may move for the motion to be decided by the entire Court. The entire Court shall then decide the motion for disqualification de novo. The Court's decision shall include the reasons for its grant or denial of the motion for disqualification.

(4)     *Motion Granted.*

    (a)     For courts other than the Supreme Court, wWhen a judge is disqualified, the action must be assigned to another judge of the same court, or, if one is not available, the state court administrator shall assign another judge.

    (b)     In the Supreme Court, when a justice is disqualified, the proceeding will be decided by the remaining justices of the Court.

(ED) Remittal of Disqualification. If it appears that there may be grounds for disqualification, the judge may ask the parties and their lawyers to consider, out of the presence of the judge, whether to waive disqualification. In the Court of Appeals and the Supreme Court, the clerk of the court may contact the parties with a written explanation of the possible grounds for disqualification. If, following disclosure of any basis for disqualification other than actualpersonal bias or prejudice concerning a party, the parties, without participation by the judge, all agree that the judge should not be disqualified, and the judge is then willing to participate, the judge may participate in the proceedings. The agreement shall be in writing or placed on the record.

Appendix D: Justice Weaver's Dissent to Administrative Order 2006-08

WEAVER, J. (*dissenting*). I dissent to the unscheduled and abrupt adoption of Administrative Order 2006-08 (AO 2006-08) by the majority of four, Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN [41] because it unconstitutionally restricts a justice's ability to perform his duty to the public by barring a justice from "giv[ing] in writing" his "reasons for each decision" and "the reasons for his dissent."[42] By adopting AO 2006-08 and ordering the suppression of my dissent in *Grievance Administrator v Fieger,* #127547, the majority of four are attempting to hide their own unprofessional conduct and abuse of power which has resulted in their failure to conduct the

---

[41] On December 6, 2006, moved by Chief Justice TAYLOR, and seconded by Justices CORRIGAN and YOUNG, the majority of four adopted AO 2006-08. Justices CAVANAGH, WEAVER, and KELLY dissented. As adopted the order states:

The following administrative order, supplemental to the provisions of Administrative Order 1997-10, is effective immediately.

All correspondence, memoranda and discussions regarding cases or controversies are confidential. This obligation to honor confidentiality does not expire when a case is decided. The only exception to this obligation is that a Justice may disclose any unethical, improper or criminal conduct to the JTC or proper authority.

CAVANAGH, WEAVER and KELLY, JJ., dissent.

Dissenting statements by Weaver and KELLY, J J., to follow.

[42] Const 1963, art 6, § 6 requires that:

Decisions of the Supreme Court, including all decisions on prerogative writs, **shall be in writing** and shall contain a concise statement of the facts and **reasons for each decision** and reasons for each denial of leave to appeal. **When a judge dissents in whole or in part he shall give in writing the reasons for his dissent.** (Emphasis added.)

60

judicial business of the people of Michigan in an orderly, professional, and fair manner.

The majority's adoption of AO 2006-08 during an unrelated court conference, without public notice or opportunity for public comment, illustrates the majority of four's increasing advancement of a policy of greater secrecy and less accountability—a policy that wrongly casts "a cloak of secrecy around the operations" of the Michigan Supreme Court.[43]

Simply put, AO 2006-08 is a "gag order," poorly disguised and characterized by the majority of four as a judicial deliberative privilege. The fact is, no Michigan case establishes a "judicial deliberative privilege," nor does any Michigan statute, court rule, or the Michigan Constitution.

AO 2006-08—the "gag order"— has been hastily created and adopted by the majority of four, without proper notice to the public, and without opportunity for public comment, despite such requirements directed by Administrative Order 1997-11. Administrative Order 1997-11(B)(2) states:

> Unless immediate action is required, the adoption or amendment of rules or **administrative orders that will significantly affect the administration of justice** will be preceded by an administrative public hearing under subsection (1). If no public hearing has been held before a rule is adopted or amended, the matter will be placed on the agenda of the next public hearing, at which time the Supreme

---

[43] *Scott v Flowers,* 910 F2d 201, 213 (5th Cir 1990).

Court will hear public comment on whether the rule should be retained or amended. (Emphasis added.)

The adoption of AO 2006-08 was not preceded by an administrative public hearing. Further, AO 2006-08 was not shown on the notice of public administrative hearing scheduled for January 17, 2007 agenda that was circulated and published on December 14, 2006. After learning that AO 2006-08 was not placed on the next public administrative hearing agenda as required by AO 1997-11, I informed by memo of the same date (December 14) the justices and relevant staff, that AO 1997-11(B)(2) requires that AO 2006-08 be included in the notice for the next public administrative hearing on January 17, 2007. That AO 2006-08 significantly affects the administration of justice is obvious given that the majority of four relied on it to order on December 6, 2006, the suppression of my dissent in *Grievance Administrator v Fieger,* #127547, motion to stay. As of today, December 19, 2006, AO 2006-08 has not been placed on the January 17, 2007 public hearing notice and agenda.[44]

The majority has not publicly articulated any reason why AO 2006-08 should be adopted, nor any reason why immediate action without prior notice to the public or a public hearing was necessary. Article 6, §6 of the Michigan Constitution requires in writing reasons for decisions of the Court. However, AO

---

[44] Note that AO 2006-08 must be placed on the public hearing notice for January 17, 2007, by December 20, 2006, to conform to the 28 day notice requirement of AO 1997-11.

2006-08 can be employed by any majority to impermissibly and unconstitutionally restrict the content of a justice's dissent or concurrence. Thus any present or future majority can in essence censor and suppress a dissenting or concurring justice's opinions.

The public has a vested, constitutional interest in knowing the reasons for a dissenting or concurring justice's divergence from a majority opinion.[45] The majority of four's efforts to censor and suppress the opinions of other justices significantly affect the administration of justice and violate the Michigan Constitution Art 6 §6. The "gag order," AO 2006-08, is unconstitutional and unenforceable. As employed by the majority in *Grievance Administrator v Fieger*, #127547, the current majority is using AO 2006-08 to censor and suppress my dissent. I cannot and will not allow it to interfere with the performance of my duties as prescribed by the Michigan Constitution and with the exercise of my rights of free expression as guaranteed by both the Michigan Constitution and the United States Constitution.

The majority of four has adopted this "gag order" (AO 2006-08) in order to suppress my dissent in *Grievance Administrator v Fieger,* motion for stay,

---

[45] By requiring that justices give reasons for their decisions in writing, Michigan Constitution Art 6 §6 gives the people of Michigan an opportunity to improve justice by providing a window to learn how their Supreme Court is conducting Michigan's judicial business. Furthermore, requiring written decisions from justices provides information and guidance for case preparation to future litigants, who may have similar issues to decided cases.

63

#127547. Finding no "gag rule" in the Michigan Constitution, statutes, case law, court rules and canons of judicial ethics, the majority of four has decided instead to legislate its own "gag order." The majority of four's "gag order" evidences an intent to silence me now, and to silence any future justice who believes it is his duty to inform the public of serious mishandling of the people's business. [46]

---

[46] On November 13, 2006, Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN voted to adopt an Internal Operating Procedure (IOP) of the Court, substantively identical to the "gag order" adopted by AO 2006-08. Justices CAVANAGH and KELLY abstained. I voted against the IOP/secret "gag rule." The majority of four adopted the IOP/secret "gag rule" in an unannounced executive session from which court staff were excluded. As adopted on November 13, the IOP/secret "gag rule" states:

> All memoranda and conference discussions regarding cases or controversies on the CR and opinion agendas are confidential. This obligation to honor confidentiality does not expire when a case is decided. The only exception to this obligation is that a Justice may disclose any unethical or criminal conduct to the Judicial Tenure Commission or proper law enforcement authority.

IOPs are unenforceable guidelines adopted by majority vote, without public notice or comment, and can be changed at any time, without public notice or comment, by a majority vote. (*See* Supreme Court internal operating procedures at <http://courts.michigan.gov/supremecourt/> (accessed on December 19, 2006), which provides in a disclaimer that the IOPs are unenforceable and only require a majority vote to be adopted.) The adoption of this IOP was never reported in the Supreme Court minutes. It appears that the majority found that the hastily adopted IOP "gag rule" would not be a proper vehicle to suppress my dissents because my dissents could not be suppressed by color of an unenforceable court guideline.

Thus, on November 29, 2006 the majority moved and seconded the adoption of an "emergency" Michigan Court Rule, another "gag rule," to suppress my dissents and concurrences. The majority discussed but tabled the new proposed emergency court rule that was substantively identical to AO 2006-08 "gag order" that was adopted on December 6, 2006.

Footnotes continued on following page.

The majority's "gag order" purportedly protects the justices' deliberations under a so-called "judicial deliberative privilege" based on unwritten traditions.

But the Michigan Constitution, statutes, case law, and court rules do not establish a judicial deliberative privilege.[47] In fact, the closest thing to a "judicial deliberative privilege" in Michigan is contained within the Canons of the Code of Judicial Conduct. It is this so-called "judicial deliberative privilege" that I have understood for my entire 32-year judicial career, and by which I strive to abide.

---

Finally, on December 6, 2006, during an unrelated court conference, without public notice or opportunity for public comment, the majority adopted AO 2006-08, the "gag order." There was no notice given to the justices that an administrative order was to be considered, nor was the matter ever on an administrative agenda of this Court. Nonetheless, AO 2006-08 was adopted by a 4-3 vote by Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN. Shortly thereafter, it was moved, seconded, and adopted by a 4-3 vote, by Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN to suppress my dissent in *Grievance Administrator v Fieger,* #127547, motion to stay. Justices CAVANAGH, WEAVER and KELLY dissented. Chief Justice TAYLOR then ordered the clerk of court, who was present, not to publish my dissent in *Fieger.*

[47]In the order, AO 2006-08 states that AO 2006-08 is "supplemental to the provisions of Administrative Order 1997-10." I note that Administrative Order 1997-10 (AO 1997-10) does not prohibit a justice of the Supreme Court from disclosing information.

By its plain language, AO 1997-10 is inapplicable. It addresses *public* access to judicial branch administrative information. The order lists types of information that this Court can exempt from disclosure *when faced with a request from the public* for that information. Administrative Order 1997-10 is not relevant to and does not prohibit a justice of this Court from disclosing information, even information that might be considered deliberative, when disclosure involves matters of legitimate public concern.

As to a judge's ability to speak regarding "a pending or impending proceeding in any court," Canon 3A(6) provides:

> A judge should abstain from public comment about a pending or impending proceeding in any court, and should require similar abstention on the part of court personnel subject to the judge's direction and control. This subsection does not prohibit a judge from making public statements in the course of official duties or from explaining for public information the procedures of the court or the judge's holdings or actions.

Canon 3A(6) thus recommends against a judge speaking on a case that is pending or impending in any court; however, Canon 3A(6) does not absolutely prohibit comment on such cases.[48]

As to a judge's "administrative responsibilities," Canon 3B *does not* even address, much less recommend or require, abstention from public comment. Canon 3 B(1) *does* state that

> A judge should diligently discharge administrative responsibilities, maintain professional competence in judicial administration, and facilitate the performance of the administrative responsibilities of other judges and court officials.

One way to "facilitate the performance of the administrative responsibilities of other judges and court officials" is to inform the public when they need to know of a misuse or abuse of power, or know of repeated, unprofessional behavior seriously affecting the conduct of the people's business.

---

[48] To abstain is "[t]o refrain from something by one's own choice." Webster's New World Dictionary, 2nd College Edition (1982).

Certainly nothing in Canon 3 can be said to create any obligation of confidentiality or permanent secrecy like that adopted by the majority of four in AO 2006-08, and in the November 13, 2006, IOP. It should be noted that there have been instances both in the past and present, in which justices have made references in opinions to matters discussed at conference and in memorandum, and to actions before the Court.[49]

---

[49] For example, most recently, in Justice CAVANAGH'S concurring statement in *In re Haley,* 476 Mich 180, 201 n 1 (2006), he stated:

> This Court is currently engaged in a discussion about the proper procedure for judicial disqualifications, as well as the ethical standards implicated in such a procedure. Further, this Court will soon be asking for public comment and input to further this discussion in a more open manner.

In addition, in his dissent in *Grievance Administrator v Fieger,* 476 Mich 231, 327 n 17 (2006), Justice CAVANAGH stated:

> Further, while I do not join in the fray between the majority and my colleague Justice WEAVER, I take this opportunity to note that three alternate proposals, two of which have been crafted by this majority, regarding how this Court should handle disqualification motions have been languishing in this Court's conference room for a substantial period of time. In the same way I will look forward to the dust settling from the case at bar, I will similarly anticipate this Court's timely attention to the important matter of disqualification motions. I take my colleagues at their word that the issue of disqualification will be handled in a prompt manner in the coming months.

Note that Justice CAVANAGH's statements, published in his concurrence in *Haley* and his dissent in *Fieger,* were not objected to by any justice, including the majority of four.

Footnotes continued on following page.

In determining when one must speak out, or abstain from speaking out, I am guided by the fact that, as a justice, I am accountable first and foremost to the public. The public expects to be informed by a justice if something is seriously wrong with the operations of the Supreme Court and the justice system. How else would the public know and be able to correct the problem through the democratic and constitutional processes? The public rightly expects the justices of this Court to act with courtesy, dignity, and professionalism toward one another. In matters of principle and legitimate public concern, however, the public does not expect a justice to "go along to get along." The public trusts, or should be able to trust, that the justices of this Court will not transform the Court into a "secret society" by making rules to protect themselves from public scrutiny and accountability.

Yet the public also expects that justices will exercise wise and temperate discretion when disclosing information regarding the operations of the Court and the justices' performance of their duties. The public does not expect, and likely would not tolerate, being informed every time a justice changes positions on a matter before the court, or every time a justice loses his temper with a colleague. The public expects justices to debate frankly, to be willing to change positions when persuaded by better argument, and to be willing to admit that they have changed their positions. Moreover, momentary, human imperfections do not

In addition to these more recent references to matters discussed at judicial conferences, see in *In re Mathers*, 371 Mich 516 (1963).

affect the work of the Court. The public would lose patience with and not support a justice who recklessly and needlessly divulged such information for intemperate or political reasons. It is an elected or appointed justice's compact with the people that, whenever possible, a justice will make all reasonable efforts to correct problems on the Court from within.

But the public needs and expects to be informed by a justice when repeated abuses of power and/or repeated unprofessional conduct influence the decisions and affect the work of their Supreme Court and the justice system. I believe it is my duty and right to inform the public of such repeated abuses and/or misconduct if and when they occur.

I recognize that there is a federal judicial deliberative privilege of <u>uncertain</u> <u>scope</u> in federal common law, but that is not Michigan law and is not binding on this Court. Moreover, the deliberative privilege articulated in federal law does not prevent a justice from speaking out regarding matters of legitimate public concern. *Pickering v Board of Educ*, 391 US 563 (1968).

The federal deliberative privilege is narrowly construed and qualified and it does not apply to administrative actions. Furthermore, that privilege is not intended to protect justices, but rather operates to protect the public confidence in the integrity of the judiciary.

For such public confidence to be warranted, the Michigan Supreme Court must be orderly and fair and must act with integrity, professionalism, and respect. In a pertinent case, the federal Fifth Circuit Court of Appeals addressed whether a

judge could be reprimanded for publicly commenting upon the administration of justice as it related to a case in his court. *Scott v Flowers,* 910 F2d 201 (5th Cir 1990). The court cited *Pickering, supra,* in recognition that the deliberative privilege could not prevent the judge from truthfully speaking out regarding matters of legitimate public concern where the judge's First Amendment rights outweighed the government's interest in promoting the efficient performance of its function.

In light of *Pickering, supra,* the *Scott* court concluded:

> Neither in its brief nor at oral argument was the Commission able to explain precisely how Scott's public criticisms would impede the goals of promoting an efficient and impartial judiciary, and we are unpersuaded that they would have such a detrimental effect. Instead, we believe that those interests are ill served by casting a cloak of secrecy around the operations of the courts, and that by bringing to light an alleged unfairness in the judicial system, Scott in fact furthered the very goals that the Commission wishes to promote. [*Scott, supra* at 213.]

The *Scott* court thus held that the judge could not constitutionally be reprimanded for making public statements critical of the court.

The federal deliberative privilege as defined in the federal common law does not extend to every utterance and action within the Court's conferences and communications. It does not protect actions taken on non-adjudicative matters involving administrative responsibilities. It also does not extend to actions or decisions of the Court, because the actions and decisions of the Court are not *deliberations,* they are <u>facts</u> that occur at the end of a deliberative period.

Further, any judicial deliberative privilege does not extend to repeated resort to personal slurs, name calling, and abuses of power, such as threats to exclude a justice from conference discussions, to ban a justice from the Hall of Justice, or to hold a dissenting justice in contempt. Nor does any judicial privilege extend to conduct such as refusing to meet with justices on the work of the Court as the majority of four have now twice done on November 13 and November 29, 2006. The privilege certainly does not extend to illegal, unethical, and improper conduct. Abuses of power and grossly unprofessional conduct are entirely unrelated to the substantive, frank, and vigorous debate and discussion of pending or impending adjudicated cases that a properly exercised judicial privilege should foster.

An absolute judicial deliberative privilege that the majority of four of this Court has wrongly created in AO 2006-08 does not exist in the Michigan Constitution, statutes, case law, court rules, or Code of Judicial Conduct, and should not be allowed to prohibit the publication of any justice's dissent or concurrence.

Perhaps further attempts to define the scope of the so-called "judicial deliberative privilege" in Michigan may be warranted. However, the privilege cannot effectively be expanded beyond that expressed within the Code of Judicial Conduct through the abrupt, unconstitutional adoption of Administrative Order 2006-08, "gag order."

71

Most importantly, any judicial deliberative privilege defined in any rule or order must not infringe on a justice's constitutional duties and rights. Const 1963, art 6, § 6 requires that

> Decisions of the Supreme Court, including all decisions on prerogative writs, **shall be in writing** and shall contain a concise statement of the facts and **reasons for each decision** and reasons for each denial of leave to appeal. **When a judge dissents in whole or in part he shall give in writing the reasons for his dissent.** (Emphasis added.)

Any new court rule or administrative order on deliberations that would force a dissenting or concurring justice to not include in his dissent or concurrence any or all of his reasons would interfere with the justice's duty under art 6, § 6. In effect, such a rule would allow the majority justices to re-write the dissent or concurrence, silence their opposition, and would be unconstitutional. AO 2006-08 is such an unconstitutional rule.

If the majority wanted to attempt to further define the so-called "judicial deliberative privilege" in Michigan, it should have done so by opening an administrative file on the issue and by inviting public comment before making a rash decision to adopt a "gag order" without public notice or comment and before implementing the "gag order" by ordering the suppression of a fellow justice's dissent. After all, any judicial deliberative privilege must serve the public's interest in maintaining an efficient and impartial judiciary, not the justices' personal interests in concealing conduct that negatively and seriously affects the integrity and operations of the Court. The public must, therefore, have a voice in

72

defining the boundaries of any expanded so-called "judicial deliberative privilege" that the majority of this Court desires to legislate. I have already expressed in dissents on administrative matters (which the majority has refused to release) that the majority of four has repeatedly abused its authority in the disposition of and closure of ADM 2003-26, the Disqualification of Justices file. They have mischaracterized final actions as straw votes and failed to correct, approve and publish minutes, and my dissents thereto, for conferences on the Disqualification of Justices file, ADM 2003-26, dating back almost ten (10) months to March 1, 2006.

Regrettably, under the guise of promoting frank discussion, the majority of four has tried to erect an impermeable shield around their abusive conduct—itself the cause of the breakdown of frank, respectful and collegial discussion on this Court. No law or rule exists to support this idea, anywhere. The majority of four have precipitously and abruptly adopted AO 2006-08 without notice to fellow justices or the public, and without opportunity for public comment.

Over the past year and longer, the majority of four, Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN, have advanced a policy toward greater secrecy and less accountability. I strongly believe that it is past time to end this trend and to let sunlight into the Michigan Supreme Court. An efficient and impartial judiciary is "ill served by casting a cloak of secrecy around the operations of the courts." *Scott, supra.*

## Appendix E

WEAVER, J. *(concurring and dissenting).* I concur only with placing on the January 17, 2007 public administrative hearing the adoption of Administrative Order No. 2006-08 (AO 2006-08), adopted by a 4-3 vote on December 6, 2006, by Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN. I dissent from the remaining language in the order.

As stated in my dissent to AO 2006-08 (filed yesterday, December 19, 2006), AO 2006-08 must be placed on the January 17, 2007, public administrative hearing because it significantly affects the administration of justice as it can be used to order the censorship and/or suppression of any justice's dissents or concurrences, as the majority of four, Chief Justice TAYLOR and Justices CORRIGAN, YOUNG, and MARKMAN, did on December 6, 2006, by ordering the Clerk of the Court to suppress my December 5, 2006, dissent from *Grievance Administrator v Fieger*, Docket No. 127547 (motion for stay).

Censoring and/or suppressing a justice's written opinion is contrary to article 6, § 6 of the Michigan Constitution and the right to free expression as guaranteed by both the Michigan Constitution and the United States Constitution. Further, censoring and/or suppressing a justice's written opinion interferes with a justice's duty to inform the public of abuse of power and/or serious mishandling of the people's judicial business.

The issue that should be of most interest and given most attention at the January 17, 2007, public administrative hearing is the constitutionality of AO 2006-08.

74

## Appendix F

**Footnote omitted from page six:**

I will re-circulate my draft dissent to the denial of the motion to stay to clarify that the person with whom I spoke was both staff of the Governor's Task Force on Juvenile Justice, a federally mandated and federally funded task force on child abuse and neglect, and an employee of the state's central FIA office in Lansing.

KELLY, J., joins the statement of CAVANAGH, J., and will be submitting her own dissent.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

December 21, 2006

Clerk

I1221

76